The next case we're going to hear is the United States v. Robinson, and Mr. Compton, one year from you. Thank you, Your Honor, and may it please the Court, my name is Nicholas Compton. I represent the appellate in this case, Shaquille Robinson. I would ask to reserve some time for rebuttal, which I see that the clerk has done. Your Honor, this case is about a young African-American man who was removed from a vehicle and subjected by law enforcement to a Terry frisk without any reasonable suspicion that he was armed and dangerous. And that is the standard that we're asking the Court to follow, the standard that was announced by the Supreme Court in Arizona v. Johnson, that the defendant was armed and dangerous. Reasonable suspicion is an objective standard based on the totality of the circumstances as the Court has announced in its U.S. v. George case. And it is a reasonable suspicion that the defendant is armed and dangerous, not just armed. And the government bears the burden of producing some facts, some evidence to suggest that the defendant, to establish the reasonable suspicion standard, again, of armed and dangerous. Can I just ask, are you focusing really on this dangerous thing and not really contesting that there was reasonable suspicion that he was armed? I believe that's correct, Your Honor, and I think that that will sort of narrows the argument here. The government has In that connection, if I'm following this along, with the now robust Second Amendment that we have, some states, as I understand it, well, I guess all states require a permit for concealed carry. Although I think some states are now moving towards you don't need a permit. West Virginia does require a permit. I think virtually every state does. And so the question becomes, in the 21st century under the new Second Amendment, is there by definition reasonable suspicion to pat down, if not everybody, at least everybody who somebody says is armed? Is that where we are? I think Your Honor gets to the point, and I believe that's what, in this case, the government is ultimately suggesting with their position, is that in West Virginia, and as the court has suggested in most states, West Virginia is an open carry state. You don't need a permit just to carry. If you want to conceal, you do need a permit. And so if you are armed, then if you follow the government's position, if you are armed and then in this ambiguously defined high crime area, then you automatically become armed and dangerous. And for somebody like Shaquille Robinson, who lives and has lived and whose family lives in the area where he was arrested, then he, by virtue of complying with the laws of West Virginia, either by openly carrying or concealed carrying with a permit, then he is automatically subject to this reasonable suspicion because he would then be armed. So is this the crux of the matter, the high crime area? Because our case law, we have to admit, at best is ambiguous. I mean, there are two lines of cases, right? There's a line of cases that say, yes, high crime area counts in the reasonable suspicious calculus. Then there's a second line of cases that say, well, now, wait a minute. You know, people live in high crime areas and people go to school in high crime areas and people walk through the streets in high crime areas. So the Fourth Amendment doesn't evaporate just because you happen to be in or live in a, quote, unquote, high crime area. OK, but is that the crux of this case, that the tip combined with the location and notwithstanding West Virginia's permit system, you get to pat down? Or was it the weird look? Was the weird look necessary to reasonable suspicion here? I don't believe so, Your Honor. It's an objective standard, first of all. And clearly, as the officer described it, the oh, crap look is a subjective means anyway. I mean, we have an officer making a stop. And he has a tip that in a parking lot where drug transactions go, it's the worst in that city. And people are even afraid to go into the store there. Someone actually sees him load the gun and put it in his belt. The officer knows this. The officer asks the fellow to step out. They're making a stop. The officer asks him to step out and asks him, is he armed? He had a permit. He says, yes, officer, I'm armed. I have a permit. He didn't say that. And it seems to me if I were an officer, objectively reasonable officer, I'd be mighty fearful in not patting this man down. And I'm a little astounded that we would ignore what the officer's explanation for his fear was, that this wasn't a guy passing through a high-crime area. He armed himself in the high-crime area at the vision to somebody else's witnessing it. They stop him. They do the Wilson, ask him to step out and ask him if he's armed. And instead of his saying, yes, I'm armed, I have a permit, he gives that look that says, oh, crap, or the officer interpreted it to be, I'm not going to help you, but I'm not going to deny it. And they frisk him. You want to be the officer making that stop with a guy looking like that in that circumstance? Your Honor, I appreciate the officer's position. Well, he just needs a reasonable suspicion, and he just needs a very brief frisk to allay the suspicion. And in this case, when he tried to allay the suspicion, it was confirmed. The suspicion was confirmed. This is not a guy frisking people in the marketplace or in the office buildings and on the streets. This officer had a justifiable concern. I'm sorry, Your Honor. I don't think the question is what is being demanded. I want to follow up on this question. I'm really not trying to step on it because I think it's really relevant. And I don't know the answer to this. It's a state law question. I know in some states, if you have a concealed carry permit, you are under an obligation, if the police stop you, to say, I have a permit, I'm armed and I have a permit. But there's nothing in the record suggesting that West Virginia is one of those states. And I know those laws are controversial. A lot of people don't like the idea that you would have to tell a police officer if you're carrying a gun. But do you know what the status is in West Virginia? I'll be honest with you, Your Honor. I am not familiar enough to say to the court exactly what is required with regard to that announce. I really didn't mean to step on it. I just think it goes to the same thing that my colleague is asking about. Yes, Your Honor. I think with regard, though, to the point that perhaps you both are getting to, I think if the court looks at the testimony that was taken by the magistrate judge, we do not have a situation here where the officer stopped the vehicle, they walked up, they looked at the defendant in the passenger seat and said, are you armed? And he just, you know, looked at them and didn't say anything. They had evidence that he was armed. So now the real question is, how far do they go in allowing the armed person to be there? And basically, if the dialogue had carried out, it could easily have said, are you armed? And the man could have answered and said, yes, I have a permit. But he didn't. And when the officer has the knowledge that he's armed and then isn't forthcoming, now there's fear. And I'm not sure that's not an unreasonable fear in that type of response. This interaction between the officers and the public is always very dicey. And at some point, we have to be a little sensitive to what reasonable officers who are on the street are concerned about. And this one seems to me he has pretty much a fair amount to suggest he legitimately was concerned. Your Honor, they didn't give him a chance. They didn't give him a chance to answer. Are you armed? How do you react to that? They asked him, are you armed, as he is being asked to get out of the vehicle. This wasn't a question of, I've conducted this stop. I'm concerned for my safety. Are you armed? Let me see what you do. I mean, the guy clearly didn't answer. He responded with a look that the officer interpreted as additional suspicion because there were so many options that the man defendant could have made responded. But he responded in a way which he was no answer, not addressing the gun concern, and basically saying what the officer interpreted as objectively. He said, oh, crap. That was the way he described it. Your Honor, I don't believe the testimony indicates that this happened in a one, two, three scenario. The officer arrived. What difference does that make? The point is the officer is making an assessment whether he's in risk, has any risk. And the exchange, regardless of the timing, the exchange prompted this particular officer to think he was at risk. Now the question is, was that reasonable? Your Honor, we suggest that they already made the determination that they were at risk before they even got to the vehicle to even have any interaction with the defendant. Officer Hudson testified that he got out of his vehicle for a seat belt traffic stop with his weapon drawn. Captain Roberts came up to the vehicle, immediately said to Officer Hudson, did you frisk him before having any interaction with Mr. Robinson? Said to Officer Hudson, did you frisk him? Hudson said, no. Captain Roberts goes up to the passenger seat, says, get out. And then says, as he's getting out, do you have a weapon? Mr. Robinson gives this subjective look that the officer interprets as, oh, crap. I have a weapon and you caught me. And then they do the frisk. Isn't that a weird thing about this case? I really struggle with this. This is a seat belt stop, right? We have to take the government sort of at its word. This is a seat belt stop. So whatever we decide about this case, we have to view this as a traffic stop. And so I don't even know which way that cuts. But it is an odd thing about this case, right? It's like we're toggling back and forth in Wren land, right? On the one hand, it's a valid stop because it was for a seat belt. On the other hand, arguably the frisk is valid because, of course, it wasn't a seat belt stop. It was a gun stop. And that just makes it hard for me at least to figure out sort of how to announce a rule for this case. Well, I think that we go back to the objective, reasonable suspicion and our position that the officers had already made that decision. Officer Hudson testified that he had left the station before the tip call had even finished. He had already made the determination that we have a young African-American at the 7-11 in this supposed high crime area. And so for us, that must mean he's dangerous. So I'm going to go. I've got a traffic stop here that I'm going to use as the pretext to make this. Why did you suggest in quotes so-called high crime? The testimony was uncontradicted that there was not only a high crime area, the highest crime area in that town. It was a parking lot in which the citizens were afraid to go into the store or go across to the apartment complex. And the transactions occurred regularly on the parking lot. I mean, and this man arms himself and puts the gun in his belt in that parking lot. This is not a so-called. That contributes to the suspicion. The officers obviously were making a drawing on their experience and the background of that. I don't think you can belittle that evidence. I see my time has expired with a court like me. I would I would simply point out to the court that the officers, those same officers with all of the experience that the court decided and the government cited in their brief, have also testified that the entire city of Ranson is a high crime area. But that doesn't take away from the fact that this was the number one place. They said this was the worst location and that private citizens had difficulty in this area engaging the normal commerce. Yes, sir. And that the transactions, the guy said they'd take the place. I don't know how many times. I can't remember what his testimony was on that parking lot. I mean, that was sort of the marketplace. And I don't think you can discount that. We're not having somebody walking along the street on Bank Street in front of the courthouse. OK, I understand your position. Thank you, Your Honor. Mr. Douglas. Thank you, Your Honor. May it please the court, Jared Douglas on behalf of the United States. This court should affirm for three reasons. The anonymous tip was sufficiently credible. There was reasonable suspicion that Mr. Robinson was armed. And there was reasonable suspicion that there was danger. Well, his argument, and it helped probably, his argument is that there was not sufficient suspicion that this defendant was dangerous. Yes. So, obviously, I saw it from the questioning and the argument that that's the issue in this case, really. And I've known that from the beginning, that it's about danger. And, first of all, I think the starting point is to look back to the Terry case and Chief Justice Warren and how he described it. Well, rather than Terry, this is J.L., right? This is Florida versus J.L. No. And the distinction, well, hear me out and then respond. If I understand the record, forget the traffic stop. As Judge Harris has pointed out, that makes it very interesting and weird and calls into mind, you know, Justice O'Connor's dissent in Wren and all of that. But seatbelt violation, the stop is okay, and the defendant's not challenging the stop. So, in a sense, you can change the facts a little bit and forget the traffic stop and the guy standing in front of the 7-Eleven. All right? That's J.L. And the only difference, if I understand the record, as Judge Niemeyer himself emphasized in questioning your colleague, is that at some moment before or as he laid on hands, he asked the guy, are you armed? As I see it, it's really the only difference between this case and J.L. In J.L., the perp had a plaid shirt, standing at a specific location at a bus stop, yada, yada, yada, he's armed. Officer jumps out, does the pat-down, doesn't conduct any investigation. Here we have, if you want to call it that, an investigation insofar as he asks the question, are you armed? Now, counsel argues that the questioning and the pat-down essentially were simultaneous. And I think the magistrate judge viewed it that way. And, by the way, the district judge didn't upset any of the factual findings of the magistrate judge, right? District judge simply reached a different legal conclusion. And now the legal conclusion that the district judge reached is before us for our determination. These are all questions of law, not questions of fact. Nobody overlooks for one second whether officers are always in danger. And we want to do everything and the law should do everything to protect these officers. They put their lives on the line every time they leave their home. But the question here is the admissibility of evidence, not the safety of the officer. The admissibility of the evidence. And so this looks like J.L. to me. It's clearly distinguishable from Navarette. And so I'm trying to figure out, with your help, why is it okay for an officer to walk up to somebody standing in front of the 7-Eleven or to pull them over in a car a few blocks away and immediately put hands on them in the face of J.L. and some of our own precedents? Your Honor, to respond to your initial question about J.L. Okay. It's not just the traffic stop that's different. In J.L., the court found that was the whole reason why the court was addressing that case, that there was not a reliable tip. So it wasn't a reliable tip. We have a reliable tip in this case. But you also cannot divorce the traffic stop out of this case. It is what makes the case. In drawing lines, it is what makes the case. The traffic stop makes the case? Yes, because. Why? Yes, because when we're talking about reasonable suspicion, there are two different standards. There's reasonable suspicion of criminal activity, which was J.L. Is he up to no good? Not is a reasonable suspicion as to armed and dangerous. And there's a difference there. And that's what, when you look at the cases even in this circuit, there aren't very many cases on point to armed and dangerous. All the cases are really about criminal activity, and they're different standards. Because there are different competing interests versus the individual's liberty. In the criminal activity cases, you're talking about the society being free from crime. In the armed and dangerous cases, you're talking about an officer being free from a bullet. There's a difference. So J.L. doesn't really speak to this case at all because we have a traffic stop. And really, to get to your hypothetical, I do think, I agree with you in this part, that there would be much more difficulty if he was just standing at the 7-11. Why? That's why. Why? Yes, Your Honor. He's still in a high-crime area. There's still this report that he's armed. You have the additional fact that apparently this tipster saw him load the gun. I'm not sure why that's significant. I gather your argument, going back to your previous argument, is that the stop can get you into Terry. Yes. Whereas if you don't have a legitimate stop, then you have to suspect a crime at that point. Yes, the phrase is stop and frisk. It doesn't matter why an officer is engaged with an individual. If the question is the pat-down, the only basis is to believe that the individual is in possession of a weapon that could be used to harm the officer or those in the vicinity. Right? Yes. It doesn't matter what the basis for the encounter is. But danger doesn't imply or require criminality. I'm agreeing with you. That's why it doesn't matter whether it's a traffic stop or not. You could meet somebody on Wall Street, and if there's reasonable suspicion that that individual was armed and dangerous, the officer can do a pat-down. Your Honor, in your case, the Massenburg opinion that you wrote, there's a major difference there because they just walk up to the officers making, I think they call it a voluntary encounter, with the four black males on the sidewalk, line them up, and start wanting to stop them to frisk them. Well, they had no reason to stop them in the first place. There was no suspicion of criminal activity. They had anonymous tips. They were shot somewhere, fired in some general hot crime area in Richmond. But they have to have a reason to stop them. I disagree with your interpretation of Massenburg. They did have a basis to stop them. The question was did they have a basis to frisk that young man. And that's the same question here. Again, there's no dispute about the stop. He claims a seatbelt violation. That's in the record. Nobody disputes that. The question is the legitimacy of going hands-on with a person. That's the question. Yes, but the only reason I'm going back to the stop is your hypothetical about stopping him at the 7-Eleven if he were standing in the parking lot. You'd have to have a reason to stop them. At that point, you don't have evidence of criminality. Correct. And you have to start with suspicion of criminality before you can get into a dangerous frisk. Yes, in this case, criminality. I've said it several times. I think Judge Davis wrote an opinion on it. I've written an opinion on that. You've got to start with a suspicion of criminality before you can even get into the dangerous frisk here. Your argument here is the theory stop on the seatbelt gets over that hurdle. That was the criminality. And now the only issue is whether the guy's armed and dangerous. Yes. And whereas a guy standing on the street, if he's armed and dangerous, you still can't frisk him. Not unless you have a reasonable suspicion of criminal activity. The criminal activity here is possession of the firearm. No, the criminal activity is the seatbelt. No, you can't search a passenger because of a seatbelt violation. Come on. That's Arizona versus Jan. I didn't say you could search him because of a seatbelt violation. I said you could stop him. What's the relevance of the seatbelt violation to the search, to the search as opposed to the stop? What's the relevance? There is no relevance. But you see, for me at least, this does, I mean, it just seems like Rennes squared to me. This seems to me to go, I also, the fact that this is the seatbelt stop, I can't quite twist my mind around it. It does seem like the government's sort of trying to have it both ways a little bit. And maybe this is technically correct. But it is odd to say, right, the stop is okay because we only stopped him for the seatbelt violation. But then to turn around and say, but come on, obviously we really stopped him because we thought he had a gun. So, of course, we have to be able to protect ourselves. It would be like if in Rennes they had argued we want the right to stop the Jeep and immediately search everyone inside because we're stopping it because they didn't, whatever it was, a U-turn without signaling. But really, come on, we're stopping it because we think they're drug dealers. And when you're dealing with drug dealers, you have to be able to frisk everyone. I just think it's, this just seems like Rennes. Isn't your argument that the object of the suspicion is different in the hypothetical and in this case? The object of suspicion to make a stop has to be criminal activity. Yes. The object of suspicion once you get a Terry stop to do the frisk is whether they're armed and dangerous. And so that we don't consider the suspicion of criminality. We consider the suspicion of whether he's armed and dangerous. Correct. That's the point you're making? Yes, Your Honor. And the traffic stop does matter to this extent. In George, which you wrote, there was aggressive driving, so that kind of went toward maybe some danger and then they developed certain facts during a traffic stop. This is a seat belt. There's no danger, at least to the community or the officers, for not wearing a seat belt. So it does factor in. It does factor in. What it does, it gets you into a legitimate encounter. It's not a voluntary encounter. It's a Terry stop. And Justice Harlan, in his concurrence, called it a forced encounter. And once you have a justified forced encounter, as he called it, then the right to frisk must automatically follow. No, it doesn't automatically follow. If you're articulating, and I understand your point, but you're articulating it wrong. I'm sorry. The stop is justified. You're in a Terry stop. You still have to have a suspicion to go further that he's armed and dangerous. Otherwise, you can't frisk him. You can get him out of the car under Wilson, but you can't frisk him until you have a suspicion of armed and dangerous. But armed and dangerous is different from criminal activity, and you got the criminal activity satisfied under a Terry stop because of the seat belt violation. In other words, it's two steps. To go further after the stop, you still have to have additional factors that he's armed, suspicion that he's armed and dangerous. My only point in agreeing in part with you is that we ought not to be looking at whether he's standing there and you can just frisk him. You have to have evidence of criminality before you even get into this analysis. And the evidence of criminality is the seat belt violation. Yes. And so now you're in a Terry stop, and in order to frisk him, the officer has to have a suspicion that he's armed and dangerous. Now, the defendant has essentially conceded that the armed is not the big issue. The dangerous is the issue. And I'll get to that second step now. We believe that based on the anonymous tip, there was a reasonable suspicion of danger, and that's because it wasn't that he was observed possessing the firearm and putting it on the side when he came out of the local firing range and putting his concealed carry permit neatly in his wallet and into his pocket. That's not what was seen. That's not what was reported. What was reported and found to be credible and is credible under NAVARETTE is that he was loading and concealing a firearm in a high-crime area. Can you answer Judge Harris' earlier question? Does state law impose a duty on a person with a concealed carry permit or license to respond to a legitimate question from law enforcement whether they are indeed presently armed? I cannot answer that question confidently. I presume that if that were the law of West Virginia, the U.S. Attorney's Office would be all over it, right? Possibly. Possibly. I think you'd know the answer if the answer were yes. But again, we're talking about a suspicion of danger, and the only thing that's important there that he didn't respond is not whether he's required to do that, but it's more about a concern that was not dispelled when it had the opportunity to be. Well, how much of an opportunity did he have? Because the burden is on you, of course, to prove the constitutionality of the search without a warrant, right? And so if you look at footnote three of the magistrate judge's report and recommendation, it seems very clear that what counsel earlier argued is exactly right. The officer basically was laying on hands or at least ordering him to turn around and put his hands on the car as he was getting out of the car. So there was no time between get out of the car and are you armed or do you have a permit. This all happened simultaneously. It happened very quickly, and it happens quickly in these type of cases. But there was at least enough time for him to feel that he didn't receive a response and that he actually received a look, whether that's weird or we want to attach some kind of long sentence that he tried to attach to it. But what's objective about it is there was a time for response. We don't know how many seconds it was. It was a fluid situation, but there was at least time for him to feel like the person should have responded. And so why couldn't the officer do exactly the same thing based on this tip if Robinson had been standing in front of the 7-Eleven instead of going down the road in a car? What's the difference? If the officer can approach Robinson based on the information that he had from the tip, how do you distinguish the interaction down the road a piece after the traffic stop from a similar interaction at the 7-Eleven given the information that the officer has? Well, at the 7-Eleven you don't have criminal activity, and you have to have criminal activity or reasonable suspicion thereof to encounter and force an encounter. Okay, and I don't want to keep repeating, but you're saying that because you can stop a car for failing to stop at a stop sign, an illegal left turn, touching the white line, you can stop a car for any reason at all. So your theory is that once you stop a car, everybody in that car becomes fair game for what? For a pat down? To be ordered out of the vehicle. Of course, that's Wilson, as Trustee Meyers says. Or Mims and Wilson. Exactly. So when can you pat down? Once they're out of the vehicle and you have, the second step, reasonable suspicion that they're armed to danger. In this case, they're still not understanding why it makes a difference because the dangerousness arises from the suspicion that he's armed in a high-crime area. It does, but being armed in a high-crime area. I want to point out our cases that when you have a voluntary encounter, there's no right to stop a person. And you don't even get into the frisk possibility until you have the right to stop a person. And Terry allows you to stop a person if you have suspicion of criminality. At that point, there's a second step that the officer, during that encounter, can assure himself that he's not armed and dangerous. And he has a reasonable suspicion to pat him down. In the hypothetical, you're just walking up to a guy and patting him down. Which is exactly what happened in Terry, right? You were going to start with Terry. Terry was not a stop. But Terry, in Terry, they thought Terry. Terry did not involve a stop. Terry Katz was standing there when this famous police officer walked up to him and immediately went hands-on, right? But he observed them casing the joint. I understand that, but it wasn't a stop. It wasn't a stop. That's why I'm suggesting to you, if the guy's standing in front of the 7-Eleven, maybe not casing the 7-Eleven, but the officer's got a report that a guy standing in front of the 7-Eleven just loaded his pistol and put it in his belt. Which is not a crime. There's not criminal activity. There has to be reasonable suspicion of criminal activity. There was in Terry because he was casing the joint. So it was a stop and frisk, or it wouldn't be called stop and frisk. It's not frisk and frisk. There has to be stop and then frisk. That's why it's different when you're in a vehicle. And this isn't the first time in the history of Fourth Circuit jurisprudence that the vehicle makes a difference. I remember my criminal procedure professors joking that don't take any contraband into a vehicle because vehicles are treated differently. And in this case, we're talking about danger. Not after Arizona began, they are treated differently. Well, in different contexts. Danger, and when this was talked about in Arizona v. Johnson, there's a wealth of statistics that that's the most dangerous situation for an officer when they're in that close proximity during a traffic stop. No question I can totally see from a police perspective this is a really difficult situation they find themselves in. But tell me what's wrong with the way, one of my reactions to that is sort of, to me it can seem counterintuitive to think that every gun during a traffic stop, any gun, you don't know if it's legally possessed. It's just dangerous. It's inherently dangerous to have a gun in the car when the police are trying to do a traffic stop. But it just seems to me that that kind of runs into the state law of West Virginia, which appears to presuppose that guns are not inherently dangerous. It's fine for people to drive around with concealed guns. And so don't the police, like everybody else in West Virginia, just have to kind of put their confidence in the legislature? They've made this determination that guns are not inherently dangerous. And in light of that, I guess I'm just not seeing why the police are allowed to frisk. This case isn't just that there was reasonable suspicion there was a gun in that vehicle. It's that two or three minutes prior, he was seen loading and concealing it while in a high-crime area. So that tips the balance. But to me, again, these laws are defended primarily or at least largely on the ground that people who live in high-crime neighborhoods need guns to defend themselves. Of course that's where you're going to have a gun. I mean, this is different from like you see someone doing a hand-to-hand exchange in a high-crime area. You think, well, if it's not a high-crime area, maybe it's not drugs. But in a high-crime area, we think that might be drugs. But it's just as rational to assume that a law-abiding, safe person is carrying a gun in a high-crime area as it is to think that a bad person is carrying a gun in a high-crime area. It's dangerous. That's the whole point. It just seems to cut absolutely at a minimum both ways in this context. I mean, that's how these laws are defended. People live in dangerous neighborhoods. They have to be able to defend themselves out on the streets, not just in their homes. When they're walking through 7-Eleven, they're at risk. This is a very dangerous 7-Eleven. So I guess I'm just so – my problem is how we come out your way without sort of kind of undermining the whole point of this concealed carry law. I agree that it can cut both ways, and I see my time is about to run out if I could just respond. I can see that it cuts both ways. But I think that's where we get to the public policy behind this. And if it's even, we should go in favor of officer safety. And with regard to the reasonable suspicion standard and criminality versus armed and dangerous, I think Judge King in his dissent in Powell stated it best when he talks about the two different interests. He says, when a police officer's life is on the line, common sense tells us that he should sooner be reasonable in his suspicion that a suspect may be armed and dangerous than in suspecting that a passerby is up to no good. All right. Thank you, Mr. Thomas. Thank you, Your Honor. Your Honor, I wanted to just, I guess, start by following up with Judge Harris's – what I think the issue was that she was trying to raise. And that gets back to what I was discussing, I think, initially is that the dangerousness. Where is the dangerousness here? We have these laws in West Virginia that say it is legal to carry a firearm. I think you're absolutely right. And I think Judge Harris is exploring that as to what obligations do you have to disclose it and can the officer ask whether you're armed. But I'm not sure that detracts from the officer's articulation of suspecting dangerousness when he asks whether a guy's armed and the guy who's not a lawyer, he's just a person who's being stopped based on these circumstances, doesn't answer and doesn't say, I've got a permit, which would be the natural human reaction to say, look, yes, I'm armed, but I've got a permit. Or just, I've got a permit. He doesn't say that. In fact, he gives an expression to the officer which the officer interprets to be contrary to that. I don't have a permit and you've caught me. That's the way the officer sees it. Now, sure, there may be a legal right to bear arms in the dangerousness, but you have to, I think, take the factual context to see whether that is an articulation of suspicion. I think it's an objective standard, though, first, Your Honor. Of course it's objective, but the question is, we have the objective. We have the expression that's given to us. Now the question, and how he took the expression, now the question is would a reasonable officer receiving that type of response conclude that a man with a gun is dangerous? And that's the legal issue in this case. I don't think that we have any evidence from the government as to, other than this one officer took it that way. He described it as an oath. We don't have any evidence the other way either. The point is you take the record as it is. But it's the government's burden. And we have an officer who says this was the response. It is not disputed as a factual matter. I don't know what an, oh, crap, quote, unquote, oh, crap look looks like. Well, he explained it. He explained it. He says, I don't want to help you. The way I took it is I don't want to help you, but I don't want to deny it. So he just kept his mouth shut like this. And I think a reasonable officer, sir, could interpret that as the man is exercising his right not to answer the officer's question. We don't get to dangerousness. We don't get to dangerousness. I understand that argument. But that, to me, is the crux of this case. Not only do we not get there, but I think the officer, if they had just, I think, perhaps taken a step or taken a breath and evaluated the situation. That doesn't help the situation. I mean, that step or the breath when the officer now has a suspicion could be fatal. But how has he gotten the suspicion, though, Your Honor? He got the suspicion because he asked him if he was armed, and the guy's response wasn't saying, yes, I am, I've got a permit, or no, I'm not armed, and now the officer knows he's lying. He comes up with something in between, which creates a suspicion the officer interpreted as, I don't want to admit it, but I don't want to deny it. And he's sort of like, you've caught me, that type of expression. Oh, crap, I've been caught. That's what the officer interpreted. I think the evidence, Your Honor, suggests from the record, as Judge Davis pointed out and as the magistrate judge found, that the activity here was nearly simultaneous. It happened almost immediately. The officer was pulling Mr. Robinson out of the vehicle, getting ready to frisk him, putting his hands on the car, and at the same time asking him, are you armed? And I think it's unreasonable at that point when somebody has a gun drawn on them by one officer, is being pulled out of the car by another officer, supposedly for a traffic stop, to then get up and say, wait, let's all stop. I've got my concealed carry permit in my back pocket if you'll just give me a chance to do it. He made a look, apparently. Maybe he didn't understand what the officer said. Maybe he's like, I thought we were just being stopped for a traffic stop, and his face contorted. But at that point it doesn't matter because he's already getting frisked and the officer has determined that there is a weapon there because these officers had already made the determination prior to them even encountering Mr. Robinson that he was dangerous for the mere fact that he was reported to have been at the 7-Eleven in a high-crime area, apparently one of many in the city of Ranson, doing a legal activity, which is loading a firearm and concealing it, assuming he had a permit. So I understand the court's point in terms of the officer's safety, and we're certainly concerned that the officer doesn't get shot in the head. But we cannot adopt a standard, which I think is what the government position would lead to, where everyone in the city of Ranson who is legally in possession of a firearm is automatically deemed armed and dangerous if they happen to run a red light, if they are going to the Home Depot in the city of Ranson and run the stop sign that's right there before the entry into the shopping center. Did you say West Virginia is an open carry? Yes, sir. It is an open carry state. Meaning, do you need a license or a permit to open carry? No, sir. Do you need a license or a permit to possess or own a pistol? No. You do not need to own a pistol. You can just go to the store and buy one and open carry. Actually, for an officer to know whether, I mean, I think we can use our common sense. For an officer to know whether a weapon is concealed by a passenger in a car, the officer's got to get the person out of the car first, right? He would have to, Your Honor. Because you can't tell if a person is concealing it on his or her person while the person is sitting in the passenger seat of a car, right? That's correct, Your Honor. The information this officer had was? Well, no, it was in his belt. It doesn't mean it's concealed. The information he had is that the pistol was in his belt. I believe that's correct. In his waist. I'm sorry. My time has expired. What was the evidence of, was there evidence that it was concealed? My understanding was of the evidence is that it was concealed, that the officers could not see it from the vehicle, and that the person who was reporting the tip, I believe, reported that he thought he saw Mr. Robinson either put it in his pocket or in his belt. I think the magistrate judge found waste in his waist. I believe that's correct, Your Honor, from the testimony. Very quick procedural question. Are you conceding, I understand you're not emphasizing, but are you conceding that the tip in this case was reliable? I think so, Your Honor, because I don't believe that we, I don't believe that the tip matters, frankly. The government wants to say that the tip. It doesn't matter without conceding that it's reliable, but you're also conceding that it's reliable. I think so. I think if the court looks at the evidence that they gave the description of the vehicle, the description of the individual, what direction it was traveling, the testimony was that the stop was made, I think, three or four minutes afterwards. So I don't know that the tip is not reliable. I think the government wants to say that the tip goes to armed and dangerous, where I think the tip only goes to armed and not the dangerous portion. All right. Thank you, Mr. Chairman. Thank you, Your Honor. We'll come down and greet counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, Pamela A. Harris, Andre M. Davis